IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CATHY D. OEHMSEN,
      Plaintiff,

vs.                            Case No.: 3:14cv493/MCR/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the

authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this

court relating to review of administrative determinations under the Social Security Act

("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court

pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the

Commissioner of Social Security ("Commissioner") denying Plaintiff's application

for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C.

§§ 401–34, and for Supplemental Security Income benefits ("SSI") under Title XVI

of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

On May 2, 2011, Plaintiff filed applications for DIB and SSI, and in both applications she alleged disability beginning April 1, 2010 (tr. 11).[1]  Her applications were denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on April 26, 2013, and on July 26, 2013, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 11–26).  On July 23, 2014, the Appeals Council denied Plaintiff's request for review (tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In his written decision of July 26, 2013, the ALJ made the following findings relative to the issues raised in this appeal (tr. 11–26).

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on March 30, 2015 (ECF No. 14).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

1)      Plaintiff meets the insured status of the requirements of the Act through December 31, 2015.[2]

2)      Plaintiff has not engaged in substantial gainful activity ("SGA") since April 1, 2010, the date she alleges she became disabled.

3)      Plaintiff has seven severe impairments: obesity, major depression, diabetes mellitus, atrial fibrillation, fibromyalgia, generalized anxiety disorder, and status post rotator cuff injury.

4)      Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart P, App'x 1.

5)      Plaintiff has the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  Specifically, she can sit for six hours and stand or walk for four hours total in an eight-hour workday.  She can perform continuous reaching, handling, fingering, and feeling.  She cannot climb ladders, ropes, or scaffolds.  She can perform occasional stooping, kneeling, crouching, and crawling. She can tolerate occasional exposure to dangerous heights and dangerous machinery.  She can understand, remember, and carry out short, simple instructions.  She can frequently understand, remember, and carry out detailed instructions and frequently interact with the general public, co-workers, and supervisors.  She is limited to occasional changes in the work setting.

6)      Plaintiff is capable of performing her past relevant work as a taxi dispatcher, as this work does not require the performance of work-related activities precluded by her RFC.  Plaintiff, therefore, has not been under

---

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is April 1, 2010 (date of alleged onset), through July 26, 2013 (date of ALJ's decision), even though Plaintiff was insured through the end of 2015. The time frame relevant to her claim for SSI is May 2, 2011 (date of SSI application) through July 26, 2013. *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

a disability, as defined in the Act, from April 1, 2010, through July 26, 2013, the date of the decision.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.   If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.   If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R., Part 404, Subpart P, App'x 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.   Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

As an initial matter, the court notes that its discussion of the three hundred seventy-six pages of medical evidence contained in the six hundred eighty-nine page administrative file is relatively limited, for the following reasons.  The court's April 1, 2015, Scheduling Order (ECF No. 15), in relevant part directed Plaintiff to file a memorandum that set forth her legal contentions and "specifically cite[d] the record by page number for factual contentions" (id. at 1, emphasis in original).  The court's Scheduling Order further instructed that "[f]ailure . . . to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development" (id. at 2, emphasis in original).

In Plaintiff's memorandum, she identifies three claims on which she seeks relief: (1) "**FUNDAMENTAL DUE PROCESS WAS VIOLATED**"; (2) "**ALJ'S ABUSE OF DISCRETION**"; and (3) "**REFUSAL OF ALJ TO GIVE ANY WEIGHT TO THE TESTIMONY OF THE VOCATIONAL EXPERT, MS. PRATTON[,] AND TO THE OPINION OF THE CLAIMIANT'S** [sic] **PSYCHIATRIST**" (ECF No. 21 at 2, 4, 7).  In support of Plaintiff's first claim, she cites only the non-medical record at page 5 (Plaintiff's request for review of the ALJ's decision), page 214 (a fee agreement between Plaintiff and her representative, Laura A. Veerman, signed by Plaintiff on March 31, 2013), and page 42 (one page of the transcript of Plaintiff's hearing before the ALJ) (*see* ECF No. 21 at 2–4).  In support of her second claim, Plaintiff references two pages of the transcript of her administrative hearing (tr. 54–55), two pages of the ALJ's opinion (tr. 15, 24), the "F17 Exhibit" (tr. 604–11), "Exhibit 22F" (tr. 671–82), "Exhibits 5F and 16F" (tr. 371–416, 592–603, respectively), and "Exhibit F," which latter exhibit is the <u>entire</u> medical record (tr. 313–689) (*see* ECF No. 21 at 4–6).  In support of her third claim for relief, Plaintiff references various pages of the transcript of her hearing before the ALJ and portions of the ALJ's decision (*see, e.g.*, *id*. at 7, 9–10, 12, 18).  She also references "Exhibits 1F through 17F, inclusive," which is a significant portion of the medical record (tr. 313–611); "all of the exhibits F (1F–23F)," which, again, is the <u>entire</u> medical record (tr. 313–689); one page of the non-medical record (tr. 107); and

approximately twenty-six specific pages of the medical record (tr. 313–17, 328, 346,

348, 351, 356, 604–11 (also identified as Exhibit 17F), 613–18, 622, 625  (ECF No.

21 at 8–10, 14).  As the only specific citations to the medical evidence provided by

Plaintiff are to the twenty-six pages identified above, these are the pages on which the

court primarily focuses its outline of Plaintiff's medical history and its substantive

review of her appeal.  Nonetheless, in order to place Plaintiff's claims in perspective,

the court incorporates by reference the ALJ's summary of the medical evidence (tr.

14–24).  The court also includes other relevant medical evidence, below, where

necessary.[4]

A.    Personal History

Plaintiff completed the twelfth grade and has past relevant work as a customer

service representative for a utility company and an insurance company, as a taxi

driver, and as a dispatcher for a taxi service (tr. 53–54, 264).  She was fifty-six years

of age on the date the ALJ rendered his decision (tr. 26, 250).

B.    Relevant Medical History

On March 13, 2009, approximately one year before the alleged onset date,

Plaintiff presented to a physician with the Santa Rosa Medical Group ("SRMG") with

---

[4] For ease of reference, in this section of the Report the undersigned will indicate the pages of the medical record that Plaintiff specifically cited by bolded page numbers.

complaints of left shoulder pain that reportedly had existed for about three weeks, as well as depression and suicidal thoughts (**tr. 356**).  Among other diagnoses, Plaintiff was assessed with left shoulder pain, diabetes mellitus, depression/anxiety, and lower back pain (***id.***).    Lisa King, M.D., prescribed medications, including Lortab, Trazadone, and Alprazolam, and she ordered x-rays of the lumbar spine (***id.***).  Plaintiff returned to SRMG in late March 2009 and complained of shoulder pain and back pain (tr. 355).  Dr. King recommended magnetic resonance imaging ("MRI") of the left shoulder (*id.*).  Plaintiff next returned in July 2009 and complained only of coughing, congestion, and difficulty hearing in the right ear (tr. 354).  A physical examination revealed no abnormalities (*see id.*).  Plaintiff again complained of coughing in August 2009, even though she had reportedly decreased her smoking (tr. 353).

In August 2009, Plaintiff was involuntarily committed to an inpatient mental health treatment facility after voicing suicidal ideation with a plan to overdose on her home medications.  Her condition improved during her stay, and she was released approximately one week later (**tr. 314–17**).

Plaintiff returned to the SRMG in late December 2009, and complained of anxiety and left shoulder pain, status post surgery, with muscle spasm and limited range of motion (**tr. 351**).  Plaintiff requested refills of her medications and noted that they "work well for her" (***id.***).  Dr. King assessed atrial fibrillation ("A-Fib"), left

shoulder pain, muscle spasm, chronic obstructive pulmonary disease ("COPD"), and anxiety (*id.*).  Dr. King advised Plaintiff to follow-up with her cardiologist for the A-Fib, and for the remaining conditions prescribed (or continued/refilled) Lortab, Flexeril, Ventotin/albuterol, and Xanax, respectively (*id.*).  In January 2010 Plaintiff complained of back pain and muscle spasm (tr. 350).  Dr. King detected no abnormalities upon examination other than some tenderness in the lower spine and paraspinal muscles; she assessed lumbago (*id.*).  Plaintiff returned in February 2010 with additional complaints of neck and knee pain (tr. 349).  On April 1, 2010 (the alleged onset date), Plaintiff complained of right leg pain and reported that her leg "give[s] out" (**tr. 348**).  Dr. King ordered x-rays of the right knee (*id.*).  Plaintiff returned in May 2010 with reports of continued knee pain and worsening anxiety (tr. 347).  On November 10, 2010 (a Wednesday), Plaintiff complained of a rapid heartbeat "since Saturday" (**tr. 346**).  Though an electrocardiogram ("EKG") revealed stable ventricular tachycardia, Plaintiff evidently was sent to an emergency room ("ER") and instructed to return to SRMG for follow-up upon her discharge (*id.*).

On November 18, 2010, Plaintiff presented to an ER and complained of an irregular heartbeat, which, she stated, had begun approximately one week prior when she was "emotionally distressed" (**tr. 328**).  She described her symptoms as "mild" (*id.*).  A physical and neurological examination revealed no abnormalities, and the

attending physician concluded that Plaintiff could "appropriately [be] discharged [to her home] with office follow up" and that Plaintiff should obtain follow-up care within five days (tr. 329–30).

Plaintiff returned to SRMG in January, April, and May 2011 (tr. 343–45). She was assessed with a variety of conditions, including A-Fib, COPD, anxiety, and lower back pain (tr. 345). At her April visit, Plaintiff saw Thomas Messe, M.D., who noted that Plaintiff was "<u>adamant</u> to receive <u>more</u> Lortab and Xanax" (tr. 344) (emphases in original). And in May, Plaintiff asked to be seen by a physician other than Dr. Messe, because "Dr. Messe would not give her enough Lortab" (tr. 343). Moudar Alshazley, M.D., and/or Dr. Messe reported that Plaintiff had a "<u>tantrum</u>" in the lobby, was "very <u>hostile</u>" and belligerent, and was using "many <u>curse words</u>" (*id*.) (emphases in original). Plaintiff was discharged as a patient from the SRMG practice, as the physicians there were no longer comfortable treating her (*id*.).

On or about May 16, 2011, Plaintiff began receiving care at the Escambia Community Clinics, Inc. ("ECC") (*see, e.g.*, tr. 365). At her first visit Plaintiff saw Owen J. Light, ARNP, and complained of A-Fib and related symptoms (*id*.). A physical examination was unremarkable (tr. 365–66). Plaintiff was assessed with A-Fib, diabetes mellitus (type II), incontinence/female stress, and tobacco use disorder (tr. 370). ARNP Light ordered screening for thyroid and lipid disorders (tr. 366, 370).

Plaintiff returned to the ECC a few weeks later for follow-up and to review the results of her lab work, which revealed some relatively minor abnormalities for which ARNP Light prescribed medications (*see* tr. 363–64).  He also advised Plaintiff to discontinue her use of tobacco (tr. 364).

Also on May 16, 2011, Plaintiff presented to the Lakeview Center and reported that she was "feeling depressed, overwhelmed, and helpless" (tr. 377).  She explained that she was stressed for a variety of reasons, including the SRMG physicians' refusal to refill her medications, her medical conditions, and her inability to find employment (*id*.).  With respect to the latter factor, Plaintiff noted she had "complet[ed] her degree in hospitality and tourism" but was unable to find work due to the BP oil spill (tr. 382).  Amy Gokey, M.A., observed that Plaintiff appeared to be depressed and angry, but that otherwise her mental status and functioning were essentially normal, including her memory, motor activities, speech, attention, concentration, orientation, and thought processes (tr. 380–81).  Ms. Gokey additionally noted that Plaintiff had "average" intellect, "fair" judgment, and "moderate" insight (tr. 381).  Plaintiff was assessed with major depressive order, recurrent, moderate (tr. 381–82).  Ms. Gokey noted that Plaintiff had not previously participated in counseling, and she encouraged Plaintiff to do so (tr. 382).

On July 13, 2011, Plaintiff returned to the Lakeview Center with complaints of

depression and trouble sleeping that occurred "every three months" (tr. 371).  She

noted she was able to take care of herself but wanted "medication management to

assist her in maintaining stability" (*id*.).  Guido Ludergnani, M.D., conducted a

psychiatric evaluation (tr. 392–95).  He noted Plaintiff's report that she was taking

Cymbalta, that it was "very useful" with her depression, and that it caused no side

effects; he also noted that Plaintiff appeared to be stable (tr. 392).  Dr. Ludergnani

noted no abnormalities upon mental examination (tr. 394).  He assessed major

depressive order, severe, without psychosis, and anxiety disorder, not otherwise

specified ("NOS"); he also assessed a Global Assessment of Functioning score of 55[5]

*id*.).  In light of Plaintiff's report that Cymbalta was "very effective" and caused no

side effects, Dr. Ludergnani continued Plaintiff on Cymbalta (tr. 395).  Plaintiff

returned to the Lakeview Center in late August 2011.  She stated she had been unable

to obtain the Cymbalta and thus had "been off of Cymbalta since her last visit" on July

13, 2011 (tr. 592).  Plaintiff was assessed with  major depressive order, recurrent,

_____

[5] Global assessment of functioning ("GAF") is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A GAF score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).

moderate, and a GAF score of 45[6] (*id.*).  Plaintiff returned to the Lakeview Center on October 12, 2011, and reported that she was back on Cymbalta (tr. 594).  Dr. Ludergnani conducted a mental status examination, which yielded essentially normal results (*see id.*).  He assessed major depressive disorder, severe, without psychosis, and anxiety disorder, NOS; he also assessed a GAF score of 55 (tr. 594–95).  Plaintiff returned to the Lakeview Center on February 8, 2012, and saw Kaberi Samanta, M.D. (tr. 596–97).  Dr. Samanta's diagnoses and GAF score (55) were the same as those assessed by Dr. Ludergnani in October 2011 (*see* tr. 597).

On February 29, 2012, Dr. Samanta completed a mental RFC assessment form and related questionnaires.[7]  Dr. Samanta concluded—after considering twenty areas of mental functioning—that Plaintiff was moderately limited in ten of those areas and markedly limited in the remaining ten areas (**tr.  604–06**; ***see also* tr. 608**).  She additionally rendered opinions which, if accepted as true, would render Plaintiff disabled at step three under the criteria of Listing 12.04 (Affective Disorders) (***see* tr.**

---

[6] A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).

[7] All of the forms completed by Dr. Samanta are "check-off" forms that provide no areas for—or otherwise contain—a narrative or explanation for her conclusions (*see* tr. 604–11).

**607–09**) and Listing 12.06 (Anxiety Related Disorders) (*see* **tr. 608, 610–11**).[8]  At a Lakeview Center visit in April 2012, R. John Sarazin, M.D., noted that Plaintiff was pleasant, cooperative, and maintained good eye contact (tr. 655).  He described her insight and judgment as "fair to good" (*id.*).  He diagnosed major depressive disorder, recurrent, as well as generalized anxiety disorder, and he assessed a GAF score of 55 (tr. 655–56).  Dr. Sarazin's treatment records from a follow-up visit in June 2012 are essentially the same, reflecting a generally normal mental status examination and the same diagnoses and GAF score (tr. 657).

On June 28, 2012, Plaintiff was admitted to the Adult Psychiatric Unit at West Florida Healthcare ("WFH") with complaints of depression (tr. 617).  She reported that although she had previously been treated successfully with Cymbalta, she felt that it was no longer effective (*id.*).  Plaintiff advised W. Barton Edwards, M.D., of multiple stressors in her life that had caused her to become severely depressed, most of which concerned her finances, family, and living situation (*see* tr. 617, 618, 619, 622).  According to Dr. Edwards, a mental status examination revealed the following:

> The patient is cooperative with examiner.  Stated mood is depressed. Affect is very depressed.  She cried several times during the interview and teared up several times trying to stop it.  She has decreased mood, energy, all the vegitative signs and symptoms of a major chemical

---

[8] *See* 20 C.F.R., Part 404, Subpart P, App'x 1, §§ 12.04, 12.06.

> imbalance depression.  As for psychosis, she says she occasionally gets
> a whoosh-like feeling in her head, but no auditory or visual
> hallucinations, illusions, delusions, thought broadcasting, insertion or
> thought withdrawal, derealization or depersonalization, and she is not
> responding to internal stimuli.  Her thought content, while slow, is well
> organized and goal-directed with no evidence of psychotic loosened
> associations, flight of ideas, tangentiality or circumstantiality.  She is
> alert and oriented to person, place and time. Memory intact all three
> spheres.  Insight and judgment intact.  She is positive for some suicidal
> ideation and I think a risk to herself.  Negative for any homicidal
> ideation.  She is markedly increased in irritability over the last year, but
> has a lot of stressors to account for this.

(tr. 621).   Dr. Edwards assessed major depression, recurrent, severe, without

psychosis, and cluster C dependant personality disorder, as well as a GAF score of "30

at best"[9] (**tr. 622**).  Plaintiff was discharged by Dr. Edwards about one week later, on

July 6, 2012 (**tr. 614**).  In pertinent part, Plaintiff's discharge summary notes that: (1)

although Plaintiff remained "sort of" down and sad, "[m]ost of it is situational"; (2)

by the end of her hospital stay Plaintiff was sleeping all night and attending group

therapy; (3) although Plaintiff's affect was flat and down upon discharge, "[m]ost of

that is [due] to the fact that she has lost her trailer and has to live with her son"; (4)

Plaintiff was not suicidal or homicidal and posed no risk of harm to herself or others;

---

[9] A GAF score between 21 and 30 reflects behavior that is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

(5) Plaintiff had no psychosis; and (6) Plaintiff was taking her antidepressants, "which she has been on for years," and was doing better (**tr. 615**).  Dr. Edwards' diagnoses were largely unchanged, although he increased Plaintiff's GAF score to "approximately 50 on discharge" (**id.**).  He also continued Plaintiff on Cymbalta, but at an increased dosage (**id.**; *see also* tr. 621).

In August 2012, Plaintiff presented to the Lakeview Center and, though she reported feeling very depressed and withdrawn, she had run out of her medications and thus had not been taking them (tr. 659).  Nevertheless, her GAF score remained at 55, and her diagnoses remained essentially the same: major depressive order, recurrent, severe, without psychotic features, and generalized anxiety disorder (*id*.).  In September 2012, Dr. Sarazin noted that Plaintiff was somewhat challenging and accusatory and had a depressed mood, but again his examination was essentially unremarkable, and his diagnoses and GAF assessment (55) remained the same (*see* tr. 661), as they did in November 2012 (tr. 663–64 (assessment made by Ronnie Fuller, M.S.)).

Plaintiff returned to the ECC in early November 2012, nearly a year and a half after her prior visit in early June 2011 (tr. 665).  She complained of fibromyalgia and related symptoms, as well as breast pain (*id*.).  A physical examination was normal (tr. 667).  Plaintiff was prescribed medications to treat her symptoms and advised to

follow-up in one month (tr. 668).  Plaintiff apparently returned in late December 2012, but the ECC record lists only Plaintiff's medications and no treatment notes (*see* tr. 670).

On May 21, 2013, Plaintiff underwent an orthopedic consultative examination by John A. Dawson, M.D., at the request of the Division of Disability Determinations of the Florida Department of Health ("Florida DDS") (tr. 672–82).  The examination revealed some decreased range of motion ("ROM") in the lumbar spine and right shoulder; ROM was normal in all other areas tested (tr. 672–74).  Dr. Dawson additionally noted, among other observations, that Plaintiff had no change in sensation in any of her four limbs, a non-antalgic gait, and full strength ("5/5") in all extremities with no signs of atrophy, and she could hop, tandem walk, heel walk, and toe walk (tr. 682).  Dr. Dawson completed a form titled "Medical Source Statement of Ability to do Work-Related Activities (Physical)."  On this form Dr. Dawson offered opinions that are consistent with the physical abilities and restrictions included in Plaintiff's RFC, as determined by the ALJ (*compare* tr. 675–80 *with* tr. 16).

Lastly, on June 14, 2013, Plaintiff underwent a consultative mental status evaluation by John F. Duffy, Ph.D., at the request of the Florida DDS (tr. 684–86).  Plaintiff's chief complaints were noted to be fibromyalgia, a bad back from a fall in 1996, her dislike of being around other people, "trust issues" with people, "depression

sometimes—I cry easy to this day," and diabetes (tr. 684).  Dr. Duffy summarized his

findings upon examination as follows:

> Ms. Oehmsen was alert, oriented x 4 and cooperative.  Speech was clear,
> and language functions were intact.  Thought processes were organized
> and goal-directed.  Eye contact was good.  Speech was at a normal rate
> and volume.  Mood is depressed, and affect is sad.  Immediate attention
> was intact with six digits forwards and four digits backwards repeated.
> Concentration was adequate with five calculations on serial sevens in 30
> seconds with one error.  Verbal abstractions were answered adequately,
> and a judgment question was answered well.  She interpreted a proverb
> well.  She named the last three Presidents in sequence and knows how
> many months and weeks there are in a year.   She spelled world
> backwards correctly.  IQ is estimated around the average range.  Insight
> is adequate.  While her mood is still depressed, she does report that it has
> "improved a little" now that she is living with her other son.  She
> recalled 4/4 words after a five-minute delay, reflecting good short tern
> auditory memory.  She denies hallucinations, delusions, obsessions,
> compulsions, panic symptoms, phobias and suicidal/homicidal ideations.
> She says she still does not like being around lots of people, but she has
> enjoyed being around people at church and had no trouble going to the
> movie or going to the beach.

(tr. 686).  Dr. Duffy assessed major depression, recurrent, and a GAF score of 55 (*id.*).

He also completed a mental RFC assessment form, on which he opined that Plaintiff

had either no, mild—or at most moderate—mental functional limitations (tr. 687–88).

Additionally, in the blank spaces provided on the form for commentary, Dr. Duffy

handwrote the factors he relied upon in support of his assessments (*see id.*).


V.     DISCUSSION OF PLAINTIFF'S CLAIMS FOR RELIEF

A.      Claim One: "**FUNDAMENTAL DUE PROCESS WAS VIOLATED**"

Plaintiff's first claim for relief is centered on the fact that the ALJ referred to her representative as an attorney during her hearing, when the record establishes that Plaintiff was represented by a non-attorney (*see* ECF No. 21 at 2–4).  This, says Plaintiff, demonstrates that the ALJ was unaware that Plaintiff's representative, Laura Veerman, was a non-attorney and, as a result, that the ALJ violated Plaintiff's right to due process.  Plaintiff additionally asserts, among other arguments, that Ms. Veerman committed a "fraud upon the forum" by failing to disclose in her fee agreement with Plaintiff that she was not an attorney and by indicating to Plaintiff that she would handle "**all**" appeals" in her case, when she is not licensed to do so (*see id.* at 2–3) (emphasis in original).  Plaintiff further claims that Ms. Veerman permitted Plaintiff to be "perpetually" interrupted by the ALJ during his questioning of her and did not prepare Plaintiff for her hearing.

Plaintiff is correct in noting that ALJ mistakenly referred to her representative as an attorney during her hearing,[10] but this does not entitle Plaintiff to relief.  Moreover, no "fraud upon the forum" was committed by Ms. Veerman, and Plaintiff received a full and fair administrative hearing.

---

[10] In the ALJ's written opinion, however, he correctly states that Plaintiff "is represented by a non-attorney representative" (tr. 11).

First, it is clear that Plaintiff knew she was not represented by an attorney, and that no representative—including Ms. Veerman—misrepresented his or her credentials to Plaintiff or the Social Security Administration ("SSA").  The record establishes that three different non-attorneys affiliated with Allsup, Inc., of Belleville, Illinois, represented Plaintiff during the administrative stages of her claims.  Plaintiff signed fee agreements with each representative, and no agreement states that the representatives are attorneys (*see* tr. 130 (agreement between Plaintiff and Teresa Huiras, signed in October 2011); tr. 165 (agreement between Plaintiff and Terry Geist, signed in January 2012); tr. 214 (agreement between Plaintiff and Laura Veerman, signed in March/April 2013).[11]  Although Plaintiff makes much of the fact that her fee agreement with Ms. Veerman does not state the converse—that is, that Ms. Veerman is <u>not</u> an attorney (*see* ECF No. 21 at 3)—Plaintiff fails to mention that she separately—but at the same time she signed the fee agreement with Ms. Veerman, and the fee agreements with Ms. Huiras and Mr. Geist—also signed "Appointment of Representative" forms with each Allsup representative (*see* tr. 132 (Huiras), tr. 164 (Geist), tr. 216 (Veerman)).  These forms clearly indicate that the  representatives are "non-attorney[s]" (*id*.).  Additionally, in requesting a hearing before the ALJ (*see* tr.

---

[11] The fee agreements note that each Allsup representative will represent Plaintiff "in <u>administrative</u> proceedings in connection with [Plaintiff's] claim for benefits under the provisions of the Social Security Act" (*see* tr. 130, 165, 214) (emphasis added).

162), Plaintiff specifically acknowledged that she was represented by a non-attorney (*see* tr. 163).  *See also* tr. 159–60 (reflecting that the SSA advised Plaintiff that she could be represented at her hearing by "a lawyer, friend, or other qualified person"); 20 C.F.R. § 404.1705 (providing that a claimant may be represented by an attorney or a qualified non-attorney).

Second, even though Plaintiff was represented throughout the administrative process, the SSA nevertheless directly advised her of pertinent information regarding the claims process and procedures, including with respect to her administrative hearing.  For example, in January 2012, the SSA mailed to Plaintiff (and to Ms. Huiras in care of Allsup, Inc.) correspondence that explained the purpose of a hearing before an ALJ and advised Plaintiff of her rights before and during such a hearing, including her right to submit additional evidence to the ALJ and review the evidence in her claims file prior to her hearing (tr. 167–68).  Plaintiff and Mr. Geist were sent an essentially identical letter in mid-February 2012 (tr. 174–75).  And in mid-March 2012, Mr. Geist submitted to the ALJ additional evidence and argument in support of Plaintiff's claims (tr. 184–85).  Notice of Plaintiff's April 26, 2013, hearing, and additional information concerning the nature of the hearing and Plaintiff's rights, were subsequently provided to both Plaintiff and Mr. Geist (tr. 186–90).

Shortly prior to Plaintiff's hearing Ms. Veerman assumed Plaintiff's representation, and—in addition to submitting to the SSA her fee agreement with Plaintiff and the "Appointment of [non-attorney] Representative" form (tr. 214, 216)—Ms. Veerman also submitted a form on which she indicated that she would be attending Plaintiff's hearing (tr. 217).  It is thus evident that Ms. Veerman committed no fraud upon the forum, and that both the SSA and Plaintiff were well aware that Plaintiff was not represented by an attorney during the administrative claims process.  That the ALJ—who conducted a hearing in Mobile, Alabama, with a representative from Belleville, Illinois—incorrectly referred to the representative as an attorney during Plaintiff's hearing is of no consequence, so long as Plaintiff received a full and fair hearing, and the ALJ adequately developed the record.

As noted above, in claiming that she did not receive a full and fair hearing, Plaintiff asserts that she was "perpetually interrupted" by the ALJ while he questioned her.  In support, Plaintiff references three pages of the transcript of her hearing (*see* ECF No. 21 at 3–4, 12–13 (quoting tr. 36–37, 42)).  While these pages reflect some interruption, the dialog is not necessarily atypical of that which routinely occurs during live testimony.  What is more, other than generally contending she was unable to present testimony "concerning the limitations in her daily living and her complicated medical history" (*id*. at 3, 12), Plaintiff has not proffered or specifically

described the testimony she was unable to provide due to the ALJ's interruptions (or alleged lack of pre-hearing preparation by Ms. Veerman), much less established that any additional testimony (or preparation) would have changed the ALJ's decision.

Moreover, prior to Plaintiff's hearing, Plaintiff identified and explained—in detail—her limited daily activities (*see, e.g.*, tr. 286, 291, 305), and during her hearing she testified to various mental and physical limitations in response to questions posed to her by the ALJ (*see, e.g.*, tr. 37–38) and Ms. Veerman (*see, e.g*, tr. 47–51).  Thus, the record contains ample evidence as to Plaintiff's limitations.  Similarly, the medical records in Plaintiff's file thoroughly document her medical history, and Plaintiff has not explained how any additional testimony would have bolstered the ALJ's understanding of that history.  Though Plaintiff further alleges that the "twenty-six (26) minute hearing was inadequate time to develop the record" (ECF No. 21 at 13), she again fails to identify any evidence that is lacking from the record or which would have been uncovered had her hearing lasted longer.[12]  *See* Edwards v. Sullivan, 937 F.2d 580, 586 (11th Cir. 1991) ("Though Edwards [an unrepresented claimant] disagrees with the ALJ's conclusions, the fact remains that those conclusions were

---

[12] As previously noted, Ms. Veerman's colleague (Mr. Geist) submitted additional evidence to the ALJ prior to Plaintiff's hearing, which the ALJ incorporated into the record.  Mr. Geist also submitted argument to the ALJ, in which he asserted that Plaintiff met the criteria of Listing 12.04 (*see* tr. 56– 57)—a point Ms. Veerman reiterated at the outset of Plaintiff's hearing (*see* tr. 34–35)—both of which put the ALJ on notice of one of the primary arguments Plaintiff raises in the instant appeal.

supported by substantial evidence, and Edwards does not indicate what facts could have been submitted by an attorney that would have changed the outcome. Consequently, Edwards was not prejudiced by her failure to be represented at the hearings.").

In sum, a review of the record, including the transcript of Plaintiff's hearing before the ALJ, reveals no "evidentiary gaps which result in unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (quotations omitted). In other words, "there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [ALJ] for further development of the record." *Id*.  Prejudice requires a showing that "the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision." Kelley v. Heckler, 761 F.2d 1538, 1540 (11th Cir. 1985).  Plaintiff has not established, and the record does not reveal, prejudice according to the foregoing standards.

Lastly, the record shows that Ms. Veerman continued to represent Plaintiff while they awaited the ALJ's decision (*see, e.g.*, tr. 224, 310–11) and while the Appeals Council considered Plaintiff's request for review of the ALJ's decision (*see* tr. 1–3).  The Appeals Council denied Plaintiff's request for review on July 23, 2014.

The notice advising Plaintiff and Ms. Veerman of the Appeals Council's decision also advised them that Plaintiff had a right to seek further review by filing a complaint in a federal district court within sixty days of the notice (*see id*.).  This action was timely filed by counsel on September 18, 2014 (*see* ECF No. 1).  Thus, it matters not whether Ms. Veerman advised Plaintiff that she would handle "all appeals" in connection with her claim for benefits, as Plaintiff alleges,[13] because no prejudice has been shown.

  B. Claim Two: "**ALJ'S ABUSE OF DISCRETION**"

  C. Claim Three: "**REFUSAL OF [ALJ] TO GIVE ANY WEIGHT TO THE TESTIMONY OF THE VOCATIONAL EXPERT, MS. PRATTON[,] AND TO THE OPINION OF [PLAINTIFF'S] PSYCHIATRIST**"[14]

  Plaintiff generally contends that "[i]t was an abuse of discretion by the ALJ to negate all favorable medical reports which would have substantially supported [Plaintiff's] view that she is [disabled] . . . ." (ECF No. 21 at 4).  More specifically, Plaintiff alleges the ALJ erred by "totally disregard[ing]" Exhibit 17F, which exhibit is Dr. Samanta's mental RFC assessment and related opinions (tr. 604–11), and the testimony of the vocational expert ("VE") (tr. 53–54), who testified that if the

---

[13] Plaintiff claims that in seeking review of the ALJ's unfavorable decision, Ms. Veerman indicated that she would handle "all appeals" on Plaintiff's behalf.  The undersigned has not located any such indication in the record, and counsel failed to include a pinpoint cite in his brief noting where in the record such an indication can be found (*see* ECF No. 21 at 2–3).  As noted, however, it matters not whether Ms. Veerman made such a statement to Plaintiff.

[14] Claims Two and Three are intertwined, and thus they are grouped for discussion.

limitations set forth in Dr. Samanta's assessment are accepted as true, Plaintiff would be precluded from all work (ECF No. 21 at 4–5).   In related arguments, Plaintiff contends that the ALJ erred:  (1) in failing to fully credit the opinions of Dr. Samanta, which correspond with a finding that Plaintiff's mental impairments satisfy the criteria of Listings 12.04 and 12.06 (*id*. at 5–6); (2) by giving significant weight to the "records of Dr. John Dawson who saw [Plaintiff] once" but no weight to the opinions of "Dr. Samanta, a specialized psychiatrist, who saw [Plaintiff] in 2003 and 2004 and three (3) times since August 2011" (*id*. at 6 (citing "Exhibits 5F [(tr. 371–416)] and 16F [(tr. 592–603)]")); and (3) by giving "no meaningful weight to the medical examination of Dr. Jennifer Meyer, Ph.D.,[15] who opined that [Plaintiff] would likely have problems carrying out detailed instructions" and performing other work-related tasks (*id*. at 9).

Initially, the court notes that some of Plaintiff's arguments are premised upon a misunderstanding of the VE's testimony.   Thus, a summary of her testimony is helpful.   Vicky Pratton, a VE, first testified regarding Plaintiff's past work and identified the exertional and skill levels of that work (tr. 53–54).   In pertinent part, and

---

[15] Though Plaintiff suggests she was examined by Dr. Meyer, the record does not support this assertion.  The record shows that Dr. Meyer reviewed Plaintiff's claims file on or about December 14, 2011, in connection with Plaintiff's request for reconsideration of the denial of her claim for DIB (*see* tr. 94–110) and for SSI (*see* tr. 111–26).

relying in part on the Dictionary of Occupational Titles ("DOT"), the VE testified that Plaintiff's prior work as a taxi dispatcher (DOT code 913.367-010) is a sedentary job, with a Specific Vocational Preparation level of 3, and is semi-skilled (tr. 54).  The ALJ then asked the VE to consider the opinions of Dr. Samanta, as "set forth on pages 1 through 3 of Exhibit 17F" (tr. 54).  The three pages identified by the ALJ correspond with transcript pages 604, 605, and 606, and reflect the opinions of Dr. Samanta that Plaintiff has "marked" limitations in ten different areas of mental functioning.  Upon being asked to consider these opinions of Dr. Samanta, the VE responded that she had actually "printed out that document and circled the things that [she] felt would preclude employment" (tr. 55).  The VE then advised the ALJ of two specific areas—of the ten areas of marked limitations—which, she determined, would preclude employment (*id.*).  The VE continued, "[a]nd then there were other things," including marked limitations in three additional areas of the ten areas of marked limitations assessed by Dr. Samanta (*id.*).  The VE then stated, "So, those were severe limitations, and there were more.  Those were just a few." (*id.*).

Plaintiff faults the ALJ for failing to ask the VE what the additional limitations were, to which the VE referred during this portion of her testimony (ECF No. 21 at 8, 18), and seemingly suggests that the VE was referring to "severe limitations" assessed by other physicians or psychologists (*see id.* at 8).  It is evident, however,

that in stating "there were more" severe limitations, the VE was referring only to the limitations assessed by Dr. Samanta—more specifically, to the remaining five areas of "marked" limitations included on pages one through three of Exhibit 17F.  The ALJ did not err by failing to ask the VE to state the obvious.  What is more, Plaintiff does not identify where in the record any other source assessed severe or marked mental limitations.  Instead, Plaintiff refers to diagnoses in the record and—citing "Exhibits 1F through 17F, inclusive"—generally claims that Plaintiff's "medical history . . . shows an absolute consistency of [Plaintiff's] psychological limitations of severe depression and anxiety disorder" (*id*. at 8).  The ALJ, however, relying in part on the diagnoses of record noted by Plaintiff, in fact deemed Plaintiff's depression and anxiety to be severe impairments.  He did not, though, conclude that Plaintiff had marked functional mental limitations or was otherwise disabled as a result of her anxiety or depression.

Turning then to Plaintiff's claim that the ALJ erred in rejecting Dr. Samanta's findings of marked mental limitations, the undersigned finds no error.  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards, 937 F.2d at 583; Sabo v. Chater,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c).  "'[G]ood cause' exists

when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ acknowledged Dr. Samanta's opinions, but he rejected them as inconsistent with Plaintiff's treatment records (tr. 23–24). The ALJ first noted that Dr. Samanta had treated Plaintiff in 2003 and 2004 or, approximately six or seven years prior to Plaintiff's onset date, but she had treated Plaintiff only three times during the relevant period (tr. 24 (referencing Exhibit 5F (tr. 371–416) and 16F (tr. 592–603), which are Lakeview Center records)). These records show that Plaintiff's first visit

to the Lakeview Center during the relevant period was on May 16, 2011, or, slightly more than one year after her alleged onset date, and that she returned to the Lakeview Center periodically through 2011 and 2012.  The  records further show, as the ALJ found, that Dr. Samanta (and numerous others) assessed GAF scores of 55, which scores indicate moderate limitations, and thus are inconsistent with the marked limitations assessed by Dr. Samanta on February 29, 2012 (tr. 24; *see also* tr. 22).  The ALJ acknowledged that at one point during Plaintiff's treatment at the Lakeview Center, she was assessed with a GAF score of 45, which indicates more serious or "marked" symptoms, but he noted that this assessment was made "only after [Plaintiff] had gone a month without medication" (tr. 24).  Indeed, the record reflects that Plaintiff had not been taking Cymbalta for more than a month when, in late August 2011, she was assessed with a GAF score of 45.  By October 2011, however, after Plaintiff had resumed the Cymbalta, Dr. Ludergnani again assessed a GAF score of 55, as did Dr. Samanta on February 8, 2012 (just three weeks before she rendered the opinions at issue here), as well as Dr. Sarazin and others at Plaintiff's follow-up visits in 2012 (*see* tr. 22).  Likewise, the conservative course of treatment undertaken by the Lakeview Center's doctors—that is, prescribing medications of limited and reasonable dosages—and the efficacy of that treatment, are inconsistent with a finding of marked mental limitations, as the ALJ noted (tr. 24, 21; *see also* tr. 19–20 (ALJ's

noting that Plaintiff "has generally not received the type of medical treatment one would expect for a totally disabled individual" and pointing, in part, to the dosages of Plaintiff's Cymbalta and Xanax)).

The ALJ also found that Plaintiff's mental status examinations, such as the one conducted by Dr. Duffy in June 2013, did not yield findings consistent with the marked limitations assessed by Dr. Samanta (*see* tr. 16).  Similarly, the ALJ found, no findings consistent with the opinions of Dr. Samanta were made during the mental status examinations conducted by Ms. Gokey in May 2011, by Dr. Ludergnani in October 2011, or by Dr. Sarazin in April and September 2012 (tr. 21; *see also* tr. 663 (Ronnie Fuller's similar assessment in November 2012)).

Continuing, the ALJ found that Dr. Samanta's opinions are inconsistent with Plaintiff's reported daily activities and interactions with others (tr. 24).  The ALJ explained that Plaintiff shopped, performed household chores, and was typically cooperative with treating sources and examiners (other than one office visit when she threw a tantrum after being denied additional medication and one visit at the Lakeview Center where she was noted to be somewhat challenging) (tr. 15; *see also, e.g.*, tr. 99 (Plaintiff's report that she lives alone, cooks, cleans, manages finances, bathes, dresses, uses the internet, and shops); tr. 364, 366, 386, 411, 505, 508, 510, 513 (various treatment records describing Plaintiff as cooperative)).  The ALJ then,

pointing to Exhibit 10E (tr. 301–06), acknowledged that Plaintiff had occasionally reported limitations in certain daily activities, such as showering, dressing, and caring for her personal needs, but he correctly noted that Plaintiff stated these limitations were due to her physical problems (tr. 15).   The ALJ further acknowledged that Plaintiff did report some lack of focus and memory problems, and that she described herself as being antisocial and having tendencies to avoid others (tr. 15–16), but he found that her reported activities were consistent with mild or, at most, moderate limitations in various areas of mental functioning—not marked limitations (*id*.).   For example, though Plaintiff described herself as antisocial, she nevertheless enjoyed being around people at church and had no trouble going to the movies (tr. 16, 22).

The ALJ additionally noted—and the record confirms—that Dr. Samanta failed to "provide an explanation for the degree of limitations she opined" (tr. 24; *see also* 604–06).   Indeed, preprinted forms, such as those completed by Dr. Samanta, do not provide persuasive evidence of the validity of the opinions expressed therein.   *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked

boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")); *see also* Edwards, 937 F.2d at 584 ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.") (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

Lastly, the ALJ pointed to Plaintiff's own testimony that she "felt Dr. Samanta did not listen to her and was not helpful" (tr. 24).  To be sure, Plaintiff complained that the treatment providers' caseloads at the Lakeview Center "are so huge," including Dr. Samanta's, and she testified that she felt like Dr. Samanta "was [not] even listening to me . . . .  It was, like, okay, you need Cymbalta, you need Trazodone. Here you go.  Bye." (tr. 39).  Thus, according to Plaintiff's own testimony, Dr. Samanta spent insufficient time with her, such that the accuracy of her opinions may reasonably be called into question.

In sum, the reasons cited by the ALJ for discrediting Dr. Samanta's disabling opinions are substantially supported by the record as a whole and, taken together, undoubtedly constitute good cause for rejecting them.

Having properly rejected Dr. Samanta's opinions, the ALJ did not err in relying upon other evidence in the record in making his findings and determinations,

including the opinions of Dr. Duffy, a consultative examiner (*see* tr. 24).  *See* 20

C.F.R. § 404.1527(c) (where substantial record evidence supports the ALJ's decision

to discount a treating physician's opinion, the opinion of an examining physician itself

becomes entitled to significant weight); Richardson v. Perales, 402 U.S. at 389 (report

of consultative examiner may constitute substantial evidence supportive of a finding

adverse to a claimant).

Although Plaintiff faults the ALJ for discounting the opinion of Dr. Meyer that

Plaintiff would likely have problems carrying out detailed instructions and performing

other work-related tasks (ECF No. 21 at 9 (referencing tr. 107)), the ALJ did not err.

Initially, as a non-examining source, Dr. Meyer's opinions are entitled to less weight

than those of an examining or treating source.  Nevertheless, the ALJ did not entirely

reject her opinions.  For example, the ALJ included in Plaintiff's RFC a limitation to

frequent—as opposed to continual—carrying out of detailed instructions.  He

additionally concluded that Plaintiff could tolerate only occasional changes in the

work setting.  The ALJ also explained why he did not accept all of Dr. Meyer's

opinions (*see* tr. 23, ALJ's rejecting some of her opinions as "vague").  Moreover, the

court notes that Plaintiff's argument as to Dr. Meyer is curious, as ultimately Dr.

Meyer opined that Plaintiff had at most only mild or moderate deficits in mental

functioning, that Plaintiff's mental impairments did not satisfy the criteria of the

listings, and that Plaintiff was not disabled and, correspondingly, that her request for

reconsideration should be denied (tr. 101, 105–09).  Thus, the ALJ's overall findings

are consistent with the overall opinions of Dr. Meyer.

It should also be noted that the ALJ did not ignore Plaintiff's June 2012

admission to the WFH psychiatric unit.  The ALJ noted, and the record confirms, that

Plaintiff "experienced an exacerbation of her mental symptoms . . . [which was]

caused by multiple social stressors" and which precipitated her June 2012 admission

(tr. 22).  The ALJ generally noted the findings of Dr. Edwards, who treated Plaintiff

during her one-week admission, including his assessment of a GAF score of 55 upon

Plaintiff's discharge  (*id*.).  Though Plaintiff's condition was evidently severe when

she was admitted—indeed, her GAF score was assessed at only 30 at that time—she

improved substantially during her one-week stay.  The records of her stay also make

clear that the underlying exacerbation of her symptoms was "situational" and atypical.

Thus, while Plaintiff relies heavily on the Dr. Edwards' records in arguing that she is

markedly limited and disabled, her reliance is misplaced.  The longitudinal evidence

shows, as the ALJ found, that Plaintiff's depression and anxiety are effectively

controlled with medication and—absent the one-time exacerbation of her symptoms

during the relevant period, in June 2012—result in no more than moderate functional

limitations.  *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("A

medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.") (citation omitted); *see also* Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citations and quotation omitted). The evidence further shows that following this brief hospitalization, Plaintiff returned to the Lakeview Center only three additional times in 2012, and thereafter apparently received no specialized mental health treatment (though she underwent a DDS consultative examination in June 2013). As the ALJ observed, "[o]n June 12, 2013 [Plaintiff] noted her mental health treatment was limited to seeing a physician's assistant" every three months (tr. 21 (citing tr. 684, Plaintiff's report to consultative examiner Dr. Duffy)).

Lastly, Plaintiff's claim that the ALJ "totally disregard[ed]" the testimony of Ms. Pratton, the VE (*see* ECF No. 21 at 18) is unavailing. As previously discussed, the VE testified that if Plaintiff indeed had multiple marked functional limitations as Dr. Samanta opined, she would be unable to work. The ALJ, however, properly rejected Dr. Samanta's opinions as unsupported. *See* McSwain v. Bowen, 814 F.2d 617, 620 n.1 (11th Cir. 1987) (an ALJ is not required to include findings in a hypothetical question to a VE that he has properly rejected as unsupported). Thus, the

ALJ was not required to accept the VE's testimony that Plaintiff would be precluded from work if she had multiple marked limitations.

Furthermore, the ALJ did not need to consult Ms. Pratton, or any other VE, in determining that Plaintiff was capable of performing her past relevant work as a taxi dispatcher.  Lucas v. Sullivan, 918 F.2d 1567, 1573 n.2 (11th Cir. 1990); *see also* Bliss v. Comm'r of Soc. Sec. Admin., 254 F. App'x 757, 758 (11th Cir. 2007) ("Vocational expert testimony is not necessary when the ALJ concludes a claimant can perform his past relevant work.") (citing Lucas, 918 F.2d at 1573 n.2).  Here, the VE testified, and Plaintiff does not dispute, that her prior work as a taxi dispatcher is a sedentary, semi-skilled job (identified in the DOT as code # 913.367-010).  And, after comparing the mental and physical demands of that prior job with Plaintiff's RFC (*see* tr. 25), the ALJ properly concluded that Plaintiff was able to perform it.  A claimant bears the burden of proving that she cannot return to her past relevant work, Lucas, 918 F.2d at 1571.  Plaintiff has not met her burden here.


D.     Miscellaneous Claims

Finally, Plaintiff appears to include miscellaneous claims related to her physical condition in her discussion of the three claims identified *supra*.  To the extent these are additional or separate claims, they are due to be denied due to their lack of proper

development and the failure to include precise citations to the record in support.  They are also due to be denied on the merits for the reasons set forth in the Commissioner's memorandum, to the extent the Commissioner has discussed them.  Additionally, the undersigned has carefully reviewed the ALJ's thorough discussion of the evidence of record, as well as his conclusions based upon that evidence—both with respect to Plaintiff's physical and mental conditions—and finds no error warranting remand or reversal.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

**DONE AND ORDERED** this $\underline{7^{th}}$ day of January 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.